[No. H005385. Sixth Dist. June 27, 1990.]

STEVEN CARNEY, Plaintiff and Respondent, v.
SANTA CRUZ WOMEN AGAINST RAPE, Defendant and
Appellant.

COUNSEL

Morrison & Foerster, Harold J. McElhinny, Sheila R. Foster, Levy & Oppenheimer, Leslie F. Levy and David P. Oppenheimer for Defendant and Appellant.

Jane E. Bednar and David S. Sabih for Plaintiff and Respondent.

OPINION

ELIA, J.—Steven Carney sued Santa Cruz Women Against Rape (SCWAR) for libel, invasion of privacy and intentional infliction of emotional distress after SCWAR published in its periodic newsletter that Carney had assaulted and attempted to rape Karen W. The jury returned a verdict in Carney's favor and awarded him $7,500 in compensatory damages and $25,000 in punitive damages.

We conclude that the trial court erred in failing to instruct the jury that SCWAR's negligence was an element of libel and in failing to instruct the jury that proof of *New York Times* malice (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]) was required in order for Carney to recover punitive damages. The judgment is reversed and remanded for a new trial.

FACTS AND PROCEDURAL BACKGROUND

On June 23, 1984, Carney and his friend Mark Wilson took a coworker, 19-year-old Karen W., out drinking. Wilson purchased the alcohol.

The next day Karen contacted SCWAR.[1] Karen told SCWAR members that Carney and Wilson took advantage of her after she passed out from intoxication. She stated that when she regained consciousness, she was in the front seat of a vehicle with her head in the lap of one man, her clothes undone, and both of the men were "touching her in what was a clearly sexual manner."

On November 24, 1984, nearly five months after the incident, and at Karen's request, SCWAR included the names of Carney and Wilson in its

---

[1] SCWAR is a nonprofit corporation organized to assist and counsel women who have been victims of abuse. It has been in existence for over 15 years. Services it provides include a rape crisis telephone hotline, ongoing support and counseling services, and a periodic newsletter published to warn women about perpetrators of assaults and other forms of harassment. Carney and SCWAR agree that SCWAR constitutes a media defendant.

periodic newsletter, along with their physical descriptions, addresses, places of employment and the statement that Carney and Wilson had "forced themselves on her." This information was included under the subheading "ASSAULT/ATTEMPTED RAPE." The newsletter was posted in public places throughout the Santa Cruz area.

SCWAR did not contact either Wilson or Carney before publishing the newsletter. There was no deadline for publishing and although members of SCWAR conceded that they had ample time to investigate, no investigation was conducted. SCWAR decided to publish based solely upon interviews with Karen and observations of her behavior.

Carney filed this action against Karen and SCWAR seeking damages for libel, invasion of privacy and intentional infliction of emotional distress. Karen cross-complained against Carney for assault and battery. Carney and Karen subsequently settled their cross-claims and, pursuant to the settlement, exchanged letters of apology. Karen's letter acknowledged that "I was not raped by you or Mark Wilson on the night described in the flyer, or at any time, and that I did not have sexual relations with you or Mark Wilson on that night or at any time."

The case proceeded to trial against SCWAR. At trial, Carney testified that he had been out with Karen on the night of June 23, 1984, and that they had engaged in various acts of sexual fondling, but that the acts were engaged in with Karen's consent. Wilson also testified. He too stated that he and Carney had been out with Karen on June 23, 1984, and that they had engaged in sexual fondling with Karen's consent. Carney and Wilson testified that Karen had been drinking, but that she had not been intoxicated.

Karen did not appear at trial but testimony from her deposition was read to the jury. This testimony, in essence, repeated what she told SCWAR: that she had passed out from intoxication, that she regained consciousness in the front seat of Wilson's car, that her head was lying in Wilson's lap, that Wilson had pulled up her T-shirt and was touching her upper body. Karen stated that she became aware that the passenger door was open, that her legs were spread, that her pants were unzipped and pulled partially down, and that Carney was at her feet, with his hands in her underpants, having just spilled beer down her pants. When asked, "Do you know to this day what Steve Carney did to you?" Karen answered, "No."

The jury was instructed that the SCWAR newsletter was subject to a qualified privilege under Civil Code section 47, subdivision 3 and therefore Carney was required to prove that SCWAR acted with actual malice. The court defined malice as follows, "The defendant acted with malice if it acted

with hatred or ill will towards the plaintiff, or it lacked reasonable grounds for believing the truth of the statements, or it made the statement for a reason other than to protect the interests of women in the community."

SCWAR argued that the malice instruction was improper and that the jury should have been instructed under the malice definition in Civil Code section 48a, subdivision 4(d). SCWAR also argued that the jury should have been instructed that Carney was required to prove *New York Times* malice to recover punitive damages. The trial court rejected both arguments.

The jury returned a verdict in favor of Carney and awarded him $7,500 in compensatory damages and $25,000 in punitive damages.

On appeal, SCWAR raises eight arguments: (1) the jury was not instructed that SCWAR's negligence or fault was an element of libel; (2) the jury was not instructed that proof of *New York Times* malice was required for Carney to recover punitive damages; (3) the jury was not instructed that proof of *New York Times* malice was required for Carney to recover presumed damages; (4) evidence of Karen W.'s settlement letter to Carney was admitted erroneously; (5) expert testimony regarding rape trauma syndrome was excluded erroneously; (6) the trial court did not adhere to certain summary adjudication rulings; (7) the misconduct of Carney's counsel warrants reversal and (8) the award of punitive damages was excessive.

DISCUSSION

## I. JURY NOT INSTRUCTED THAT NEGLIGENCE AN ELEMENT OF LIBEL

SCWAR argues that the jury instructions did not inform the jury that negligence was an element of Carney's libel case and that the instructions allowed the jury to impose liability without fault. We agree.

In *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 347 [41 L.Ed.2d 789, 809-810, 94 S.Ct. 2997], the United States Supreme Court held that so long as they did not impose liability without fault, the states could define for themselves the standard of liability for defamation of private individuals. More recently, in *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711 [257 Cal.Rptr. 708, 771 P.2d 406], the California Supreme Court concluded that negligence was the standard in California: "We decline to diverge from the near unanimous authority that a private person need prove only negligence (rather than malice) to recover for defamation." (*Id.* at p. 742.) *Brown* held that "a publication or broadcast by a member of the news media

to the general public regarding a private person is not privileged under section 47(3) regardless of whether the communication pertains to a matter of public interest. Thus, a private-person plaintiff is not required by section 47(3) to prove malice to recover compensatory damages." (*Id.* at p. 719.)

■ That a private plaintiff is not required to prove malice is based upon the state's interest in protecting the reputation of private individuals. (*Gertz v. Robert Welch, Inc., supra*, 418 U.S. at p. 343 [41 L.Ed.2d at p. 807].) An "individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.' " (*Id.* at p. 341 [41 L.Ed.2d at p. 806], quoting *Rosenblatt v. Baer* (1966) 383 U.S. 75, 92 [15 L.Ed.2d 597, 609, 86 S.Ct. 669] [conc. opn. of Stewart, J.].) Unlike public officials or public figures, (cf. *Fletcher v. San Jose Mercury News* (1989) 216 Cal.App.3d 172, 183-184 [264 Cal.Rptr. 699]) private individuals are more vulnerable to injury and therefore the state has a greater interest in protecting them. (*Gertz v. Robert Welch, Inc., supra*, 418 U.S. at p. 344 [41 L.Ed.2d at p. 808].)

In this case, the jury was instructed that the SCWAR newsletter was privileged under Civil Code section 47, subdivision 3 and that Carney was therefore required to prove that SCWAR acted with "actual malice." The court defined malice: "[t]he defendant acted with malice if it acted with hatred or ill will towards the plaintiff, or it lacked reasonable grounds for believing the truth of the statements, or it made the statement for a reason other than to protect the interests of women in the community."

■ The court's malice instruction was improper. The jury should have been instructed that SCWAR's negligence, rather than malice, was an element of libel. In particular, the jury should have considered whether SCWAR acted with reasonable care in checking on the truth or falsity of the information before publishing it in its newsletter. (Cf. *Brown v. Kelly Broadcasting Co., supra*, 48 Cal.3d at p. 749; Rest.2d Torts, § 580B, pp. 227-228.)[2] Although the instruction given did refer to SCWAR's reason-

---

[2] The Second Restatement of Torts section 580B also abides by a negligence standard. It provides in pertinent part, "One who publishes a false and defamatory communication concerning a private person, . . . is subject to liability, if, but only if, he [¶] (a) knows that the statement is false and that it defames the other, [¶] (b) acts in reckless disregard of these matters, *or* [¶] (c) *acts negligently in failing to ascertain them*." (*Id.* at pp. 221-222 [italics added].) The Restatement also notes several factors which can be used in determining whether the defendant acted as a reasonably prudent person, such as whether the communication was so topical that it required prompt publication in order to be useful, whether the interests the defendant sought to promote were public ones as opposed to the mere spread of gossip and the extent of damage to the plaintiff's reputation if the communication was false. (*Id.* at pp. 228-229.)

ableness, it also permitted the jury to impose liability if SCWAR "acted with hatred or ill will" or "it made the statement for a reason other than to protect the interests of the women in the community." This was error.

Nor was the error cured because, as Carney argues, the instruction required proof of a higher degree of fault than negligence. First, the portion of the instruction referring to "hatred or ill will" is not necessarily a higher degree of fault than negligence. That a libel defendant acts with hatred or ill will does not automatically establish that the defendant fails to exercise reasonable care in determining whether a communication is untrue.

Second, by permitting the jury to impose liability if SCWAR published "for a reason other than to protect the women in the community," the instruction allowed the jury to impose liability without fault. There was evidence that SCWAR published its newsletter for several reasons. One reason was to attract new members. Thus, the jury could have found the requisite "malice" on this basis alone. In this respect, the instruction violates the statement in *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at page 347 [41 L.Ed.2d at page 809], that the states may not impose liability without fault.

In sum, even though the instruction given referred to SCWAR's reasonableness, the instruction was still improper because it was framed in terms of "malice," and, being phrased in the disjunctive, it permitted the jury to impose liability because SCWAR acted with hatred or ill will or published for a reason other than to protect the interests of women in the community.

Carney argues that a malice instruction nearly identical to the one here was used with approval in *Manguso v. Oceanside Unified School Dist.* (1984) 153 Cal.App.3d 574, 580-582 [200 Cal.Rptr. 535].) *Manguso,* however, involved a qualified privilege under section 47(3) and the instruction was based upon that fact.[3] In this case, both Carney and SCWAR now agree, based upon the holding in *Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at page 719, that the SCWAR newsletter is not subject to a privilege under section 47, subdivision 3. Given that section 47, subdivision 3 is inapplicable, and that *Manguso* involved a section 47, subdivision 3 instruction,

[3] For example, by referring to making statements for reasons "other than protecting the interest of the one for whom protection is given," the instruction guards against abuse of the qualified privilege. (See e.g. Rest.2d Torts, § 603, pp. 291-292; *Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 797 [197 P.2d 713].) Of course, the original reason for the privileges—strict liability for defamation—no longer exists. In fact, as noted in *Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at page 747, some commentators suggest that there is no need for the privileges since the law now requires proof of fault before recovery for defamation may be had.

*Manguso* cannot be considered authority for the proposition that the instruction utilized here was correct.

Having concluded that the instruction was improper, we now consider whether the error warrants reversal. (Cal. Const. art. VI, § 13.) ■ This requires us to determine if the error was "likely to mislead the jury and thus to become a factor in its verdict, . . ." (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353]; citing 4 Witkin Cal. Procedure (2d ed. 1971) pp. 3056-3057.) In other words, " '[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court "should not speculate upon the basis of the verdict." ' " (*Id.*, quoting *Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)

Factors to be considered are " '(1) the degree of conflict in the evidence on critical issues . . . ; (2) whether respondent's argument to the jury may have contributed to the misleading effect . . . ; (3) whether the jury requested a rereading of the erroneous instruction . . . or of related evidence . . . ; (4) the closeness of the jury's verdict . . . ; and (5) the effect of other instructions in remedying the error . . . .' " (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 771 [206 Cal.Rptr. 354, 686 P.2d 1158], quoting *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)

■ Application of the factors to this case convinces us that reversal is warranted. First, the instruction misstated the law. Carney was required to prove SCWAR's negligence, but there was no instruction which relayed that fact to the jury. There was a total failure of the jury to consider this issue. (Cf. *Wilkinson* v. *Bay Shore Lumber Co.* (1986) 182 Cal.App.3d 594, 603 [227 Cal.Rptr. 327, 61 A.L.R.4th 111].) Nor were there any other instructions remedying the error. There was no reference whatsoever to a requirement that SCWAR be determined to have acted negligently. We think it impossible for the jury not to be misled when the instructions wholly failed to inform them that whether SCWAR acted with reasonable care was an essential element in Carney's case.

Second, Carney stressed at trial that the jury should impose liability if any of the three definitions of malice were met. He argued that one reason SCWAR published the newsletter was to attract new members and that the jury could impose liability upon this basis. For example, he stressed, "Are you satisfied in your community somebody is sentencing an attempted rapist in order to visit [*sic*] new members?" He also argued that there was evidence of hatred or ill will because: "This is the bigotry. This is the organization that hates all men. . . . [¶] They are trying to generate war

between the sexes. Men and Woman [*sic*] should live in harmony. They should love each other." We think these arguments, focusing on something thoroughly unrelated to whether SCWAR exercised reasonable care, demonstrate that the jury was likely misled, thereby resulting in reversible error. (Cal. Const., art. VI, § 13.)

This case is analogous to *Henderson v. Harnischfeger Corp., supra,* 12 Cal.3d 663. In *Henderson,* the court reversed a judgment because a jury instruction misstated the law, despite the fact that another instruction framed the issue properly. The court noted, " 'The prejudicial effect of a *misstatement* of an *important principle of law* cannot easily be overcome by another declaration contradicting it.' " (*Id.* at p. 673, quoting 4 Witkin, Cal. Procedure (2d ed. 1971) p. 3055, original italics.) The instant case presents a stronger case for reversal because here there was no other instruction which informed the jury that SCWAR's negligence was an element of Carney's libel case. In sum, we conclude that the failure to instruct on negligence was prejudicial and requires that the matter be reversed and remanded for a new trial.

## II.  JURY NOT INSTRUCTED THAT *New York Times* MALICE REQUIRED FOR PUNITIVE DAMAGES

■ SCWAR argues that the jury should have been instructed that Carney was required to prove *New York Times* malice before Carney could be awarded punitive damages. We agree.

■ "A private-figure plaintiff must prove at least negligence to recover any damages and, when the speech involves a matter of public concern, he must also prove *New York Times* malice, *supra,* 376 U.S. 254, to recover presumed or punitive damages." (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 747, citing *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at pp. 347 and 349 [41 L.Ed.2d at pp. 809-811] and *Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749, 756 [86 L.Ed.2d 593, 600-601, 105 S.Ct. 2939].) *New York Times* malice is established if the communication was published "with knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706].)

■ Carney concedes that the jury was not instructed on *New York Times* malice. He contends a *New York Times* instruction was not required because the newsletter was not a matter of public concern. Accordingly, we must determine whether the SCWAR newsletter addresses a matter of public concern.

Determining what constitutes a matter of public concern is a difficult task. As our own Supreme Court noted, arguably anything published by the news media is in the public interest. (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 752.) " 'To a significant extent, the mere act of publishing material in the mass media creates public interest in its contents. The more sensational and hence injurious a statement is, the more "public interest" it generates.' " (*Id.* at p. 752 [citations omitted].) For guidance on this issue, we look to *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. 749.

In *Dun & Bradstreet,* the Supreme Court considered whether *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, applied to defamatory statements not involving matters of public concern. A credit reporting agency had sent a report to five subscribers indicating that a construction contractor had filed a petition for bankruptcy. The report was false. The contractor sued for defamation and, after a jury trial, was awarded compensatory and punitive damages. On appeal, the reporting agency argued that the trial court's instructions allowed the jury to award punitive damages without a showing of knowledge of falsity or reckless disregard for the truth. This, argued the reporting agency, violated the requirements of *Gertz.*

The Supreme Court concluded that *Gertz* did not apply because the defamatory statements did not involve a matter of public concern. In so determining, the court stressed that " '[w]hether . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record.' " (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. at p. 761 [86 L.Ed.2d at p. 604], quoting *Connick* v. *Myers* (1983) 461 U.S. 138, 147-148 [75 L.Ed.2d 708, 720, 103 S.Ct. 1684].) The court noted that certain types of speech, such as commercial speech, are less central to the First Amendment than others. (*Id.* at p. 758, fn. 5 [86 L.Ed.2d at p. 602], quoting *Ohralik* v. *Ohio State Bar Assn.* (1978) 436 U.S. 447, 456 [56 L.Ed.2d 444, 453, 98 S.Ct. 1912].)

The court then concluded that the credit report concerned no public issue but was speech "solely in the individual interest of the speaker and its specific business audience." (472 U.S. at p. 762 [86 L.Ed.2d at p. 604].) The court also pointed out that the report was communicated to only five subscribers, did not involve a " 'strong interest in the free flow of commercial information' " (*ibid.,* quoting *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 764 [48 L.Ed.2d 346, 96 S.Ct. 1817]), that this type of credit reporting did not require special protection to ensure that " 'debate on public issues [will] be uninhibited, robust, and wide-open' " (*ibid.,* quoting *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 270 [11 L.Ed.2d

at p. 701]), and that the credit report was unlikely to be deterred by state regulation, given that it was solely motivated by the desire for profit, and the "market provides a powerful incentive to a credit reporting agency to be accurate." (*Id.* at pp. 762-763 [86 L.Ed.2d at p. 605].)

We think the SCWAR newsletter plainly dealt with matters of public concern. The content, form and context of the newsletter portray a publication dedicated to addressing the general topic of sexual assault and harassment. Included in the newsletter was a list of certain services provided by SCWAR, such as the operation of a rape hotline, low-cost women's self-defense groups, the availability of counseling services to assault victims, and the availability of SCWAR members to lecture and provide other public information services about matters of sexual harassment. These valid concerns were included with the description of men that the SCWAR newsletter alleged had been "hassling/assaulting/raping" women.

Unlike the matter in *Dun & Bradstreet,* the topic here is not solely in the individual interest of the speaker and its specific business audience. To the contrary, sexual harassment and violence against women is of pressing public concern.[4] In addition, the publication here, unlike the credit report in *Dun & Bradstreet,* was not motivated solely by the desire for profit and thus was more likely to be deterred by state regulation. (Cf. *Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 755 [court noted that most media entities operate for profit and "[w]ith rare exception, it is fanciful to view the news media as a group of lonely leafleteers"].)

Carney argues that these circumstances simply represented "three young persons voluntarily engaged in a drinking and petting party." As such, he argues no matter of public concern was at stake. This argument frames the issue improperly. Carney is stating that there is no matter of public concern because the allegations were false. However, all libel, by definition, is false. (Civ. Code, § 45.) We think a more appropriate inquiry is whether, as *Dun & Bradstreet* pointed out, the form, context and content of the publication as a whole demonstrate that a matter of public concern is implicated. Accordingly, we have focused on the broad topic of the newsletter in general, dealing with matters of sexual harassment and assault, rather than the specific accusation that a private individual committed a specific crime, as a basis for determining that this newsletter constitutes a matter in the public concern.

---

[4] The fact that these issues are of public concern is well illustrated by the recently released Draft Report of the Judicial Advisory Committee on Gender Bias in the Courts. The report, which is titled, "Achieving Justice for Women and Men in the Courts," includes several disturbing examples of incidents of gender bias and sexual harassment against women. Based upon these findings, the committee has proposed a number of recommendations, all of which are aimed at remedying the problems documented in the report.

Because the SCWAR newsletter dealt with a matter of public concern, the jury should have been instructed that Carney was required to prove *New York Times* malice before being allowed to recover punitive damages. No such instruction was given. The punitive damage award was therefore error.[5]

## III. INSTRUCTIONS ALLOWED RECOVERY OF PRESUMED DAMAGES

■ SCWAR argues that the jury instructions permitted the jury to find presumed damages without proof of *New York Times* malice and that this was error. We conclude that this contention is without merit.

In *Gertz* v. *Robert Welch, supra*, 418 U.S. 323, the Supreme Court discussed actual injury in libel cases: "Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." (*Id.* at p. 350 [41 L.Ed.2d at p. 811].)

In this case, the jury was instructed under BAJI No. 7.10. That instruction listed factors such as plaintiff's good name, plaintiff's shame and plaintiff's prominence in the community as elements the jury could consider in determining plaintiff's damages. The instruction also noted, however, that "the law does not establish any absolute or fixed or mathematical rule or standard by which to compute such damage; therefore, you must exercise your discretion, but must do so without passion or prejudice for or against either party."

SCWAR argues the reference to "discretion" in effect transformed the instruction into one which permitted the jury to award presumed damages.

---

[5] SCWAR, citing *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485 [80 L.Ed.2d 502, 104 S.Ct. 1949], argues that we should independently review the record to determine whether there was evidence of *New York Times* malice to support an award of punitive damages. SCWAR misconstrues *Bose* and its progeny. The rule in *Bose* is designed to ensure that a libel judgment does not violate constitutional principles. (See e.g. *Bose Corp.* v. *Consumers Union of U.S., Inc., supra*, 466 U.S. at p. 511 [80 L.Ed.2d at p. 523]; *Harte-Hanks Communications, Inc.* v. *Connaughton* (1989) 491 U.S. 657, 685-686 [105 L.Ed.2d 562, 587-588, 109 S. Ct. 2678, 2695]; *Fletcher* v. *San Jose Mercury News, supra*, 216 Cal.App.3d at pp. 184-185.) The judgment here contains no finding of *New York Times* malice; the jury was never instructed on that issue. Thus, the judgment does not yet implicate these constitutional concerns. If, upon retrial, the jury determines that SCWAR acted with *New York Times* malice, then appellate review of that judgment will be guided by the principles set forth in *Bose* and *Harte-Hanks Communications.* That time, however, has not yet arrived.

However, we think it is beyond question that the instruction had no such effect. The instruction listed the elements the jury should consider in determining Carney's damage and noted, quite correctly, that there is no mathematical formula for determining such damage. The reference to discretion simply informed the jury that, there being no fixed formula, some amount of discretion would have to be exercised for the jury to determine a dollar amount. Accordingly, the instruction fully comports with the language in *Gertz*. No error occurred.

## IV. ADMISSION OF KAREN'S LETTER OF APOLOGY

SCWAR argues that admitting Karen's letter of apology into evidence violated Evidence Code section 1152, subdivision (a).[6]

Section 1152, subdivision (a) of the Evidence Code bars evidence of settlement or compromise to prove the liability of the settling party. It provides in pertinent part, "Evidence that a person has, in compromise . . . furnished . . . money or any other thing, act, or service to another . . . is inadmissible to prove his or her liability for the loss or damage or any part of it."

The rule prevents parties from being deterred from making offers of settlement and facilitates the type of candid discussion that may lead to settlement. (*Fieldson Associates, Inc.* v. *Whitecliff Laboratories, Inc.* (1969) 276 Cal.App.2d 770, 773 [81 Cal.Rptr. 332].) "[T]he public policy in favor of settlement of disputes makes it inadvisable to penalize the person who seeks settlement by allowing his unaccepted offer to be used as an admission." (1 Witkin, Cal. Evidence (3d ed. 1986) § 424, p. 398.)

SCWAR cites *Tobler* v. *Chapman* (1973) 31 Cal.App.3d 568 [107 Cal.Rptr. 614] to support its argument that Karen's letter was inadmissible. In *Tobler*, a nonsettling defendant attempted to inform the jury that a codefendant had settled with the plaintiff. The court noted that any evidence of settlement was inadmissible, under Evidence Code section 1152, subdivision (a), to establish the *liability* of the settling defendant. (*Id.* at p. 575.) In this case, by contrast, the letter was not introduced to prove Karen's "liability" for any "loss or damage." The letter was admitted as evidence regarding the truth or falsity of the statements in the SCWAR

---

[6]Section 1152, subdivision (a) provides: "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."

newsletter as part of Carney's effort to establish SCWAR's liability. Thus, given that the plain language of the statute provides that evidence of a settlement is inadmissible to prove *liability* of the settling party, and that Karen's letter was not admitted to establish her liability, we conclude that the trial court did not err in admitting the evidence.

## V. ADMISSIBILITY OF EVIDENCE ON RAPE TRAUMA SYNDROME

■ SCWAR contends the trial court erred by excluding lay and expert testimony regarding rape trauma syndrome. SCWAR offered the testimony of a staff psychologist at Kaiser Hospital in San Francisco and the testimony of a SCWAR staff member, regarding rape trauma syndrome, to establish that various aspects of Karen's behavior were consistent with rape trauma syndrome.

In *Delia S. v. Torres* (1982) 134 Cal.App.3d 471 [184 Cal.Rptr. 787], expert testimony regarding rape trauma syndrome was admitted to explain certain aspects of the plaintiff's post-assault behavior that seemed inconsistent with the behavior of an unconsenting victim. For example, the victim in *Delia S.* allowed quite a bit of time to pass before reporting that the rape had occurred.

Subsequently, in *People v. Bledsoe* (1984) 36 Cal.3d 236, 238 [203 Cal.Rptr. 450, 681 P.2d 291], our Supreme Court determined that evidence of rape trauma syndrome is not admissible to prove that a rape occurred. *Bledsoe* was distinguished from *Delia S.* because in *Bledsoe*, "the prosecution introduced the rape trauma syndrome testimony, not to rebut misconceptions about the presumed behavior of rape victims, but rather as a means of proving—from the alleged victim's post-incident trauma—that a rape in the legal sense had, in fact, occurred." (*Id.* at p. 248.) The court determined that the testimony was inadmissible for this purpose.

In so determining, *Bledsoe* stressed that rape trauma syndrome was not created to decide the truth or accuracy of a claim of rape. Instead, it was devised by "professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients. As the professional literature makes clear . . . because in the past women who have brought charges of rape have traditionally had their credibility or motives questioned by the police and others, rape counselors are taught to make a conscious effort to avoid judging the credibility of their clients. . . . [¶] Thus, as a rule, rape counselors do not probe inconsistencies in their clients' descriptions of the facts of the incident, nor do they conduct independent investigations to determine whether

other evidence corroborates or contradicts their clients' renditions." (36 Cal.3d at pp. 249-250.)

Thus, *Bledsoe* determined that "because the literature does not even purport to claim that the syndrome is a scientifically reliable means of proving that a rape occurred, we conclude that it may not properly be used for that purpose in a criminal trial." (36 Cal.3d at p. 251.) However, *Bledsoe* also noted that where the evidence is offered to explain conduct which a juror might deem inconsistent with a rape claim, then "in such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (36 Cal.3d at pp. 247-248.)

In this case, SCWAR offered the testimony to show that aspects of Karen's behavior were "characteristic" of rape trauma syndrome. For example, the fact that Karen acted irrationally after the incident, had trouble concentrating and felt embarrassed were reactions which Karen's attorney argued were consistent with rape trauma syndrome. However, we think that this pattern of behavior was, as was the case in *Bledsoe,* the type of behavior a lay juror would normally associate with a sexual assault. There was nothing about Karen's conduct which seemed inconsistent with her allegations of sexual assault. As the trial court, in rejecting the evidence, stated, "We have a jury and they are going to determine this question. I agree with Bledsoe that the jurors have good common sense and that they can evaluate." Accordingly, we conclude that the evidence of rape trauma syndrome was not admissible to explain these types of reactions.

SCWAR also argues that the evidence was admissible to explain why SCWAR believed Karen's charges were true. However, as *Bledsoe* stressed, rape trauma syndrome was not developed as a truth-finding device but was designed as a therapeutic tool. It does not function as a gauge of the client's credibility. Thus, just as evidence of rape trauma syndrome cannot be used to prove that a rape occurred, the evidence also should not be used to explain or justify SCWAR's belief that a sexual assault took place. In both circumstances, the evidence creates an aura of "special reliability and trustworthiness" which is not warranted given the purpose, history and nature of rape trauma syndrome. (*People* v. *Bledsoe, supra,* 36 Cal.3d at p. 251.)

This does not mean, however, that SCWAR cannot describe Karen's behavior and explain that it found such behavior convincing on the issue of whether an assault occurred. As *Bledsoe* acknowledged, evidence of the victim's emotional and psychological trauma is admissible; lay jurors, however, are fully competent to assess such evidence. Likewise, in this case, the

jury is competent to determine whether SCWAR was reasonable in relying upon Karen's behavior alone as justification for publishing the information in its newsletter. (36 Cal.3d at p. 251.)

Finally, SCWAR argues that the evidence was admissible to explain why Karen wrote the letter of apology to Carney. Although we have found nothing in the record to suggest that the rape trauma syndrome evidence was offered for this purpose, we think that, upon retrial, the evidence could be admissible under this theory. Karen's letter to Carney is undoubtedly behavior inconsistent with a claim of sexual assault. It seems safe to assume that most lay jurors would think it unusual for a victim of a sexual assault to apologize to her alleged attacker.

It is true that the letter only acknowledged that Karen had not been "raped" and had not had "sexual relations" with Carney; therefore one might argue that, because Karen never claimed to have had intercourse with Carney, the letter of apology was actually consistent with her claim. However, we believe that the implication most jurors would naturally draw from the letter was that Karen was withdrawing all allegations of nonconsensual sexual activity. Given that such behavior is at odds with a claim of sexual assault and assuming that SCWAR can establish that this conduct is in fact one aspect of rape trauma syndrome, we conclude that the evidence would be admissible for this purpose.

## VI. OTHER CONTENTIONS ON APPEAL

SCWAR raises a number of other contentions in its appeal, such as the trial court's refusal to follow certain summary adjudication rulings, the misconduct of counsel for Carney, the fact that Carney recovered his costs twice and the argument that the punitive damage award was excessive. In light of our determination that the error in jury instructions requires that the case be reversed and remanded for a new trial, we do not address these remaining issues.

The judgment is reversed and the matter is remanded for further proceedings in accordance with this opinion. Costs to be awarded to appellant.

Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.