Filed 2/11/26  Sentinel Strategic Services v. Solera at Apple Valley Community Assn. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| SENTINEL STRATEGIC SERVICES, LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>SOLERA AT APPLE VALLEY COMMUNITY ASSOCIATION, INC.,<br><br>    Defendant and Respondent. | G065189<br><br>(Super. Ct. No. 30-2024-01399350)<br><br>O P I N I O N |

        Appeal from an order of the Superior Court of Orange County, Lee L. Gabriel, Judge. Affirmed.

        Kenny Law Group and Jeffery S. Kenny for Plaintiff and Appellant.

        Tinnelly Law Group and Sarah A. Paas for Defendant and Respondent.

*        *        *

This is an appeal from an order partially granting a motion pursuant to Code of Civil Procedure section 425.16[1] (the anti-SLAPP statute) in a lawsuit between plaintiff Sentinel Strategic Services, LLC (Sentinel), a security company, and defendant Solera at Apple Valley Community Association, Inc. (Solera or the association), a common interest development. The parties' dispute over their agreement for security services led to the instant lawsuit, which included claims for defamation and other torts in addition to breach of contract. Solera filed an anti-SLAPP motion, which the court granted except as to Sentinel's contract-related claims.

In this appeal, Sentinel argues, with respect to the first prong of the anti-SLAPP analysis, that the court erred by concluding that its claims involved a public issue or issue of public interest. As to the second prong, Sentinel contends the court erred by determining it had not presented sufficient evidence to demonstrate minimal merit on its defamation claims. We disagree and affirm the order.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

Solera is an age-restricted senior common interest development in Apple Valley. The association is comprised of approximately 3,000 residents and 1,676 lots. The association is governed by a volunteer board of directors (board) and assisted by a management company.

In late April 2023, Sentinel and Solera entered into a contract (the agreement) under which Sentinel would provide security services for Solera beginning July 1. The board hired Sentinel to prevent property crimes, physically protect association property, enforce the association's rules, verify

---

[1] Subsequent statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

identity at entry points, and assist residents. The agreement provided for security coverage on a 24/7 basis, with the amount of coverage determined by the time of day. Overall, the agreement provided for 52 hours per day of security officer presence at a rate of $32 an hour. The agreement included a termination clause, which we will discuss in detail in our discussion.

Relations between the parties deteriorated quickly. What went wrong is the subject of dispute between the parties. Matters worsened when a Sentinel patrol car became inoperable, which led to a subsequent payment dispute.

In a letter dated December 22, Sentinel demanded payment of an outstanding balance "in order not to disrupt/halt security services." (Formatting omitted.)

Solera, in a letter dated January 2, 2024, sent a written 60-day termination notice pursuant to the terms of the agreement. Sentinel stopped providing security services on or about January 1 and notified the board by e-mail on January 2, stating it was terminating its services because Solera had breached the agreement by failing to pay in full.

On the same day, Solera sent the following notice to its community mailing list (which had approximately 1,000 e-mail addresses) and posted it on its community Facebook page (which had approximately 536 followers): "Since July 1st Sentinel Strategic Services has managed our security operations for the community. During their tenure the Board of Directors has voiced concerns to them about their overall performance based upon observations of the Directors and feedback from the community. Ultimately, they were unresponsive to some of the concerns expressed and we as the Board of Directors felt that a change was necessary. The contract with Sentinel required a notice of termination and an agreed upon period for that

3

transition to occur. We provided Sentinel with the appropriate notice, per the contract, and they made the decision to abandon their operations today without notice." (Formatting omitted.) (Collectively, we refer to the e-mail message and Facebook post, which were substantially identical, as the post.) The post continued with information about temporary steps, including using management personnel to staff the gates.

According to Solera, the post was published because Sentinel's sudden departure left community members without security. This was particularly problematic due to lengthy response times from the sheriff's department. Subsequently, Solera paid the amount it apparently believed it owed Sentinel, but Solera refused Sentinel's demand to remove the post from Facebook.

In May 2024, Sentinel filed the instant lawsuit, pleading eight causes of action, including: 1) breach of contract; 2) breach of covenant of good faith and fair dealing; 3) breach of Business and Professions Code section 17200; 4) intentional interference with prospective economic relations; 5) negligent interference with prospective economic relations; 6) defamation per se (libel); 7) defamation per se (slander); and 8) temporary restraining order, preliminary and permanent injunctive relief.

Solera filed its anti-SLAPP motion in July, contending its statements to the community about Sentinel's departure concerned issues of public interest and Sentinel could not establish the minimal merit necessary to maintain its causes of action. Sentinel opposed, contending the dispute did

4

not involve an issue of public interest or issue and it could establish each element of defamation per se.[2]

The trial court granted the anti-SLAPP motion as to all causes of action with the exception of breach of contract and breach of the implied covenant of good faith and fair dealing. Sentinel now appeals.

DISCUSSION

I.

SOLERA'S ANTI-SLAPP MOTION

*A. Statutory Context and Standard of Review*

"The purpose of the anti-SLAPP statute is to dismiss meritless lawsuits designed to chill the defendant's free speech rights at the earliest stage of the case." (*Timothy W. v. Julie W.* (2022) 85 Cal.App.5th 648, 657.) The anti-SLAPP statute states: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

As relevant here, section 425.16, subdivision (e), defines an "'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue'" as: "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of

_____

[2] Both in the trial court and in its opening brief in this court, Sentinel limits its discussion on the second prong of the anti-SLAPP analysis to the defamation claims. We therefore deem its remaining claims abandoned.

5

public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

The anti-SLAPP analysis involves two steps. "At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).) In deciding whether the plaintiff's cause of action is subject to an anti-SLAPP motion, "the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)

"'On appeal, we review the trial court's decision de novo, engaging in the same two-step process to determine, as a matter of law, whether the defendant met its initial burden of showing the action is a SLAPP, and if so, whether the plaintiff met its evidentiary burden on the second step.'" (*Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1162.)

*B. Protected Activity*

We must first decide whether the challenged claims arise from acts in furtherance of Solera's right of free speech or right of petition under one of the categories set forth in section 425.16, subdivision (e). "A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park v. Board of Trustees of California State University* (2017)

6

2 Cal.5th 1057, 1062–1063.) "[T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.'" (*Ibid.*)

"Courts should analyze 'each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected.'" (*Bishop v. The Bishop's School* (2022) 86 Cal.App.5th 893, 904.) "In deciding whether the initial 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, quoting § 425.16, subd. (b)(2).)

*C. Public Issue or Issue of Public Interest*

As noted above, section 425.16, subdivision (e)(3), states that "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" is within the scope of the anti-SLAPP statute. The same is true of subdivision (e)(4), which states that the following is within the ambit of the anti-SLAPP statute: "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." [3]

The contours of the public issue requirement of the anti-SLAPP statute have evolved significantly in the past few years, and citations to older

_____

[3] We use the terms "public issue" and "issue of public interest" interchangeably.

cases are of questionable value.[4] The California Supreme Court provided new guidance to lower courts in *Geiser v. Kuhns* (2022) 13 Cal.5th 1238 *(Geiser).* In *Geiser,* the factual context was "a sidewalk picket purporting to protest a real estate company's business practices after the company evicted two long-term residents from their home." (*Id.* at p. 1243.) Approximately 25 to 30 members of the group Alliance of Californians for Community Empowerment (Alliance), an advocacy group, picketed outside the home of Greg Geiser, the CEO of Wedgewood, a real estate company. (*Id.* at pp. 1243, 1251.)

Subsequently, Geiser sought civil harassment restraining orders against numerous individuals associated with a protest outside of his home, including the former homeowners and the director of Alliance. (*Geiser*, *supra*, 13 Cal.5th at p. 1245.) The defendants filed an anti-SLAPP motion, which was denied by the trial court. (*Id.* at p. 1246.) "The Court of Appeal held the activity at issue to be beyond the scope of anti-SLAPP protection, concluding that the picket did not implicate a public issue and concerned only a private dispute between the company and the residents it had evicted." (*Id.* at p. 1243.) The Supreme Court ultimately disagreed, found the activity protected, and remanded the case. (*Ibid.*)

---

[4] The same is true of issues relating to the first prong generally. Older case law states that we should look to the "*principal thrust or gravamen*" of a plaintiff's claims to determine where the claim is based on protected activity. (See, e.g., *Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272.) We must be cautious using this language following the California Supreme Court's decision in *Baral, supra,* 1 Cal.5th 376. That framework may only be used "to determine whether particular acts alleged within the cause of action supply the elements of a claim [citation] or instead are incidental background." (See *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012.)

The Supreme Court granted review to clarify the application of the two-part test it had articulated a few years earlier in *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*). The Court noted in *FilmOn* that "[o]ur courts have ably distilled the characteristics of 'a public issue or an issue of public interest.'" (*Id.* at p. 149.) But what appellate courts had sometimes had difficulty doing was articulating "the requisite nexus between the challenged statements and the asserted issue of public interest—to give meaning, in other words, to the 'in connection with' requirement" of the anti-SLAPP statute. (*FilmOn*, at p. 149.)

Accordingly, the Supreme Court in *FilmOn, supra*, 7 Cal.5th at pages 149–150, set forth a two-step analytic framework for cases where anti-SLAPP protection was claimed under section 425.16, subdivision (e)(4), the statute's "catchall provision."[5] "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*FilmOn*, at pp. 149–150.) Noting that "virtually always, defendants succeed in drawing a line—however tenuous—connecting their speech to an abstract issue of public interest" subdivision (e)(4) "demands 'some degree of closeness' between the challenged statements and the asserted public interest." (*FilmOn*, at p. 150.)

---

[5] Although it is not specifically addressed, we believe the same two-step analysis applies to motions under section 425.16, subdivision (e)(3). It makes little difference in the instant case, as Solera contended it was entitled to protection under both provisions.

Applying this test in *Geiser*, the Court noted the appellate court had decided that the demonstration outside Geiser's home "'focused on . . . a private matter concerning a former homeowner and the corporation that purchased her former home,' and not on 'any societal issues of residential displacement, gentrification, or the root causes of the great recession.' We do not see why defendants' expressive activity fits only one characterization and not both." (*Geiser, supra*, 13 Cal.5th at p. 1250.)

The evidence in *Geiser* included a declaration from a legal observer stating the purpose of the demonstration was "'"to protest unfair and deceptive practices used by Wedgewood . . . in acquiring the real property of [the former homeowners], and evicting them from their home."'" (*Geiser, supra*, 13 Cal.5th at p. 1250.) There were other indications in the record that the protest implicated more than the plight of two individuals, including the involvement of the Alliance, "an advocacy organization committed to 'fight[ing] against the displacement of long[-]term residents' and to 'sav[ing] homes from foreclosures.'" (*Id.* at p. 1251.) "It is common knowledge that foreclosures, evictions, and inadequate housing are major issues in communities throughout California, and the participation of more than two dozen members of an advocacy group dedicated to fighting foreclosures and residential displacement must be considered against that backdrop." (*Ibid.*)

The appellate court, the Supreme Court held, "overlooked the ways in which these contextual considerations inform the expressive meaning of the protest outside Geiser's home." (*Geiser, supra*, 13 Cal.5th at p. 1252.) "*FilmOn*'s first step is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute. Only when an expressive activity, viewed in context, cannot reasonably be understood as

10

implicating a public issue does an anti-SLAPP motion fail at *FilmOn*'s first step." (*Id.* at pp. 1253–1254.) "If a reasonable inference can be drawn that the challenged activity implicates a public issue, then the analysis proceeds to *FilmOn*'s second step." (*Id.* at p. 1254.) "[T]he touchstone is objective reasonableness." (*Id.* at p. 1255.)

At the second step of the *FilmOn* analysis, which asks about the "functional relationship exists between the speech and the public conversation about some matter of public interest," the court must consider the speech's context. (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.) In *Geiser,* that context was the sidewalk demonstration. (*Geiser, supra,* 13 Cal.5th at p. 1255.) "The context makes clear that this sidewalk protest furthered public discussion of the public issues it implicated. It is a paradigmatic example of 'conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest.'" (*Ibid.*)

1. First Step of *Geiser* Test

Applying the two-step test in *Geiser* to the instant case, "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech." (*FilmOn, supra,* 7 Cal.5th at pp. 149-150.) *Dubac v. Itkoff* (2024) 101 Cal.App.5th 540, distilled the first step of the *Geiser* test down to five factors to assist in determining what qualifies as a public issue: "1. The statement concerns a person or entity in the public eye; [¶] 2. the statement concerns conduct that could directly affect a large number of people beyond the direct participants; [¶] 3. the statement concerns a topic of widespread public interest; [¶] 4. the issue is of concern to a substantial number of people; or [¶] 5. the issue has been the subject of extensive media coverage." (*Id.* at p. 549.)

11

The speech at issue here, which was the content of Solera's post, directly implicates the second, third, and fourth factors. The association, which includes 3,000 residents, is a sufficient number to qualify as "large." (See *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 475–480.) The post concerned an urgent issue, specifically Sentinel's departure from the community, which directly affected the residents, not only Sentinel and the association. Given the slow response times of the sheriff's department, the lack of onsite security was directly pertinent to the lives of all Solera residents and was therefore a matter of widespread public interest. Therefore, the answer to the question of what public issue was raised by the speech is fairly simple: the abrupt lack of onsite security.

2. Second Step of *Geiser* Test

"Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*FilmOn, supra*, at pp. 149–150.) Here, the functional relationship between the post and the issue of onsite security was direct and obvious. The association suddenly lost its onsite security, and it was necessary for residents to be notified that this may cause them difficulty and inconvenience until Sentinel was replaced.

Despite Sentinel's claims to the contrary, this was not a private contractual dispute between two parties. Sentinel was the primary provider of immediate response in the community, due to the slow response times of law enforcement. This case is therefore factually distinguishable from cases where the enforcement of CC&Rs between an association and a single resident was determined not to be a public issue. (See *Joslin v. Third Laguna Hills Mutual* (2020) 49 Cal.App.5th 366.) Here, it was of immediate importance to inform the residents of the lack of onsite security services. The

12

issue raised by the post "furthered public discussion of the public issues it implicated." (*Geiser, supra,* 13 Cal.5th at p. 1255.) The post both informed the homeowners and created the opportunity for dialogue between residents and the board regarding future security services.

In sum, we find Solera met its burden to establish the first prong of the anti-SLAPP statute. Our ruling does not imply that all cases involving homeowners associations are subject to the anti-SLAPP statute. (See, e.g., *Turner v. Vista Pointe Ridge Homeowners Assn.* (2009) 180 Cal.App.4th 676 [complaint challenging enforcement of covenants did not implicate association's right to free speech or petition]; see also *Dubac v. Itkoff, supra,* 101 Cal.App.5th at p. 552 [relating a case in some way to a homeowners association does not automatically create a public issue].) Cases involving homeowners associations are subject to the same analysis as those involving any other defendant.

## D. Minimal Merit

In the second step of the anti-SLAPP analysis, "the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral, supra,* 1 Cal.5th at p. 396.) As noted above, the only causes of action that Sentinel argued below or in this court are the two defamation claims. While only a showing of minimal merit is required, the plaintiff must nonetheless present evidence that has a reasonable probability of being admitted at trial. (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 947.)

Although Sentinel pleaded separate causes of action for defamation per se (libel) and defamation per se (slander), under California law, slander and libel are not distinct, but fall under the broader definition of

13

defamation. Thus, Sentinel pleaded two causes of action for the same tort, and we analyze both claims together.

To establish a claim for defamation, a plaintiff must show "the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645.) A plaintiff must also demonstrate, at minimum, that the false statement was made negligently. (*Carney v. Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1016.) A statement is defamatory per se if its defamatory meaning is plain on its face and does not need extrinsic information to be understood. (*ZL Technologies, Inc. v. Does 1-7* (2017) 13 Cal.App.5th 603, 623; *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 290.)

The complaint alleged the following statements in Solera's post were defamatory: "Plaintiff's current and prospective clients and security services purchasers by posting reprehensible false statements on both Defendants' public Community Facebook page and sending a . . . blast email to all of Defendants' listserv contacts, of which some were Plaintiff's current and prospective clients and security services purchasers, stating things such as: (1) the contract with Sentinel required a notice of termination and an agreed upon period for that transition to occur; (2) '[Defendants] provided Sentinel with the appropriate notice, per the contract, and [Plaintiff] made the decision to abandon their operations'; and (3) '[Sentinel] made the decision to abandon their operations today without notice.'" (Formatting

14

omitted.) Additionally, in the slander cause of action,[6] Sentinel alleged the following statements were made to "current and prospective clients and purchasers:" "(1) the contract with Sentinel required a notice of termination and an agreed upon period for that transition to occur; (2) '[Defendants] provided Sentinel with the appropriate notice, per the contract, and [Plaintiff] made the decision to abandon their operations;' (3) '[Sentinel] made the decision to abandon their operations today without notice;' (4) 'Defendant didn't give a required 2-week notice, per the contract;' and (5) 'Sentinel was informed of their pending termination and walked off the job.'" (Formatting omitted.)

We can group the alleged written and oral statements into two categories for our purposes: 1) statements about the nature of the contractual requirement for terminating the contract, and 2) statements that Sentinel ended its services at Solera without notice.

1. Contractual Requirements for Termination

The agreement's termination clause is set forth in full below.

"**Termination**. This Agreement may be terminated by either Party, with or without cause, upon 60 days' written notice to the non-terminating Party. On the material breach of this Agreement by the Client, Sentinel may indicate its intent to terminate by providing Client a written 14-Day Notice of Intent to Terminate which shall specify the reason for the intended termination. Client shall be allowed 14 days from the date of the receipt of any such notice to remedy the alleged breach, after which time Sentinel may issue a Notice of Termination if the alleged breach has not been corrected. Upon any such termination, Sentinel shall be entitled to collect from Client the value of any Services performed by Sentinel before the date the Notice

---

[6] Sentinel complains the trial court did not properly consider all of its evidence on this claim. But this is not reversible error on an issue subject to de novo review.

15

of Termination was sent. Sentinel shall be entitled to recover the existing amount due from Client and all other sums to which Sentinel may be entitled under law and shall be entitled to remove from the Premises all equipment furnished by Sentinel located or installed thereon. Removal of any such equipment or the cessation of any such services supplied by Sentinel shall not be a breach by Sentinel of this Agreement or a waiver by Sentinel of any damages or rights."

Sentinel makes much of the following language:[7] "On the material breach of this Agreement by the Client, Sentinel *may* indicate its intent to terminate by providing Client a written 14-Day Notice of Intent to Terminate which shall specify the reason for the intended termination." (Italics added.) Therefore, Sentinel argues, Solera's statements about the nature of the contractual requirements were false and defamatory, because it was not required to give any notice. Indeed, it claims because Solera owed Sentinel money, it was the party that breached and terminated the contract.

With respect to the termination clause, we turn to basic principles of contract interpretation. "'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' [Citations.] 'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.'" (*Hot Rods, LLC v. Northrop Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166, 1178, fn. omitted.)

We agree that on its face, the language Sentinel points to is permissive. But we immediately run into a problem when we read the next sentence of the termination clause: "Client *shall* be allowed 14 days from the date of the receipt of any such notice to remedy the alleged breach, after

---

[7] Sentinel also complains that the trial court did not sufficiently address this issue in its ruling. We disagree, but in any event, on de novo review of a purely legal issue, it is not reversible error.

which time Sentinel may issue a Notice of Termination if the alleged breach has not been corrected." (Italics added.) This is an important, material term, which appears to give Solera the opportunity to cure the breach, and it is not permissive, it is mandatory. (See *Woolls v. Superior Court* (2005) 127 Cal.App.4th 197, 208 ["may" and "shall" in the context of statutory interpretation].)

Under Sentinel's suggested interpretation, it would have sole discretion as to whether Solera was to be given an opportunity to cure by deciding whether or not to provide notice of the alleged breach. But we question whether this interpretation is a reasonable one, or if Solera, which placed great importance on continued security services, reasonably believed it would have the opportunity to cure *any* alleged breach. This is an interesting question of contractual interpretation which may require extrinsic evidence to resolve. (See *Ticor Title Ins. Co. v. Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699, 1707.) But it is not one we are required to resolve here.

If reasonable minds can differ as to the meaning of an ambiguous, poorly drafted provision in a contract, then it is impossible to call one interpretation of that provision either "false" or made negligently, as required under defamation law. The same is true of Sentinel's theory that the contract was already terminated by Solera's breach. Whether that is true is a disputed legal question, not a false statement. Accordingly, we find that while Solera's interpretation of the events here may ultimately be right or wrong, its statements were not, under the law, defamatory. At most, they were statements of nonactionable opinion.

2. Statements that Sentinel Ended Services Without Notice

The other category of statements include various comments that Sentinel stopped services without notice. Sentinel claims a December letter

17

from its counsel provided notice that it would end services. The letter stated: "Nevertheless, my Client has graciously agreed to finalize the dispute for the simple payment of the entirety of the reduced amount owed pursuant to the November Invoice in the amount of Fifty-Five Thousand Two Hundred Fifty-Two Dollars ($55,252) to be paid by Solera directly to my Client . . . in order to not disrupt/halt security services." (Formatting omitted.) Solera claims the language "in order to not disrupt/halt security services" provided notice of termination under the agreement.

We disagree. This was a demand letter written by an attorney. Threatening a "disrupt/halt" to security services if the demand was not met was not the equivalent of a notice of termination. This interpretation is buoyed by the fact that the letter, dated December 22, did not provide the requisite 14-day cure period under the contract. Further, Sentinel does not provide any authority for the proposition that it should be read as either a 14-day or 60-day notice under the termination clause. It is undisputed that Sentinel stopped serving the community in early January, rendering several of Solera's statements substantially true. (See *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 154.) While the use of the word "abandon" was inflammatory, it was not demonstrably false given the overall context of the dispute between the parties.

In sum, we find that Sentinel failed to satisfy its burden as to the second prong. Accordingly, we affirm the order granting the anti-SLAPP motion as to the third through eighth causes of action.

18

## DISPOSITION

The order is affirmed. Solera is entitled to its costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


DELANEY, J.


SCOTT, J.