Filed 9/11/23  San Francisco Federal Credit Union v. Fielding CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specifed by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAN FRANCISCO FEDERAL CREDIT UNION, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> RODNEY FIELDING, <br><br>     Defendant and Respondent. | A163729 <br><br> (Contra Costa County Super. Ct. No. C2100811) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on August 21, 2023, be modified as follows:

1.  In the second full paragraph on page 17, after the fifth sentence which ends, "Fielding made comments that could reasonably be considered as asserting or implying provably false assertions of fact, even if some details are missing." insert the following footnote:

> In a petition for rehearing, Fielding argues that the challenged statements that "[t]he CEO refuse[d] to take appropriate precautions" and that "[t]he CEO [was] very selective" in providing information to the Board and gave them "false information to keep

them at bay" are not actionable by the Credit Union because they specifically refer to Oliver.  However, as the Credit Union pointed out in its opening brief, "[t]here is no requirement that the person defamed be mentioned by name. [Citation.] It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff. [Citation.]  It is sufficient if the publication points to the plaintiff by description or circumstance tending to identify him." (*Di Giorgio Fruit Corp. v. AFL-CIO, supra*, 215 Cal.App.2d at pp. 569–570; see also *Dong v. Board of Trustees* (1987) 191 Cal.App.3d 1572, 1587 [" 'it is of course possible that two persons may stand in such a relation that defamation of one will be found to reflect upon the reputation of the other' "].)  Moreover, "language which casts aspersions upon its business character is actionable" by the business. (*Di Giorgio Fruit Corp. v. AFL-CIO*, at p. 571.)  Because Fielding's post is about the Credit Union's inadequate COVID-19 measures, the statements that refer to its CEO's actions (or lack thereof), when read in context, can reasonably be understood as accusations directed at the Credit Union.  (See *id.* at p. 570 ["it is clear even from the references to [the individual founder of the corporation] that the defamatory accusations are directed at the corporate owner of the ranch"].)

Furthermore, even if we were to conclude that those particular statements are not actionable by the Credit Union, the outcome of this appeal would not change.  As explained in more detail below, the Credit Union established a probability of prevailing as to at least some of the other challenged statements in Fielding's Facebook post, and those statements are actionable by the Credit Union.

This footnote will become footnote number 7, renumbering all subsequent footnotes accordingly.

2.  On page 21, the third sentence of the second full paragraph is replaced with the following sentence:

He further claimed that "[o]ther infections at the branches went unreported and un treated [sic]" and that the "CEO of the organization refuse[d] to take appropriate precautions to protect the employees and members."

There is no change in the judgment.

The petition for rehearing, filed September 5, 2023, is denied.


Dated:

_____          Margulies, Acting P.J.

Filed 8/21/23  San Francisco Federal Credit Union v. Fielding CA1/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| SAN FRANCISCO FEDERAL CREDIT UNION,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>RODNEY FIELDING,<br><br>  Defendant and Respondent. | A163729<br><br>(Contra Costa County<br>Super. Ct. No. C2100811) |

Respondent Rodney Fielding posted claims on Facebook that his former employer, appellant San Francisco Federal Credit Union (the Credit Union), failed to take adequate measures to protect its employees and members from the risks of the COVID-19 pandemic.  In response, the Credit Union sued Fielding for defamation and trade libel.  The Credit Union now appeals from an order granting Fielding's anti-SLAPP motion to strike those claims.  (See Code Civ. Proc., § 425.16.)[1]

We conclude that the trial court should have denied Fielding's motion in part because the Credit Union presented sufficient prima facie evidence to establish the probability it would prevail on its defamation claim.

---

[1]  "SLAPP" stands for "strategic lawsuit against public participation." (Code Civ. Proc., § 425.18.)  All statutory references are to the Code of Civil Procedure unless otherwise specified.

1

Consequently, we reverse and direct the trial court to enter an order denying the motion to strike as to the Credit Union's defamation claim.[2]

## I. BACKGROUND

The Credit Union is a member-owned credit union that serves members in San Francisco and in the surrounding communities. Fielding worked for the Credit Union as an information security engineer from November 2017 until July 2020, a few months after the City and County of San Francisco declared a lockdown for businesses and residents due to the COVID-19 pandemic. As an essential business, the Credit Union continued to operate and conduct business during the pandemic.

### A. *Fielding's Facebook Post*

In March 2021, several months after his termination, Fielding made a Facebook post in which he said that he had "received this video/post from an unknown source which took place at a former employer of mine today." The post included a picture of a poster that depicted a drawing of a person's face and which stated, "If there's one thing here that is always dependable, it's that your lives are always EXPENDABLE" and "Covid Who? Warn the staff? That 3 employees tested positive. NAH." The evidence indicates that another former employee of the Credit Union, Ryan Alcon, used the poster during his protest at a branch of the Credit Union where he criticized the Credit Union's

---

[2] The Credit Union purported to assert a cause of action for "declaratory and preliminary and permanent injunctive relief." However, declaratory and injunctive relief are equitable remedies and not causes of action. (See *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 618.) The anti-SLAPP statute applies only to "causes of action." (§ 425.16, subd. (b)(1).) Fielding agrees that the Credit Union's declaratory relief claim is "tethered to" its defamation claim. Because we conclude that the Credit Union met its burden to show a probability of prevailing on its defamation claim, as we explain below, we also conclude that there is no basis to strike the declaratory and injunctive relief allegations from the complaint.

2

handling of a recent outbreak of COVID-19 among its employees. The drawing on the poster purported to depict the Credit Union's CEO, Jonathan Oliver (Oliver).

Fielding's Facebook post continued, "Recently 3 more employees have tested positive for COVID-19 and [the former employer] ha[s] done nothing about it. Sadly [sic] this is not the first time this has happened there either. The CEO of the organization refuses to take appropriate precautions to protect the employees and members." The post discussed past examples of the Credit Union's alleged failure to take adequate COVID-19 precautions. First, Fielding asserted that the CEO had refused to implement a "Pandemic plan" that Fielding had written prior to the COVID-19 pandemic. Fielding also claimed that although a "few" employees were allowed to work from home for about two months, "employees were required to come into the office even though we have remote capabilities." He further asserted that "[o]ther infections at the branches went unreported and un treated [sic]," that "inquiries from the SF Department of Public Health have gone unanswered by the CEO," and that "[the CEO] clearly cares more about his own pockets and bonuses than he does about his employees that actually do the work." He further claimed that the "CEO is also very selective as to what he tells the Board of Directors" and that he (Oliver) "gives them false information to keep them at bay."

Fielding concluded his post by asking, "What is it going to take for [the CEO] to do the right thing? God forbid an employee (or their family member) dies from COVID-19 because it was brought home from this place. This is one of the worst places I have ever worked and one of the worst CEO's [sic] I have EVER dealt with." Following this last assertion, Fielding inserted a series of

3

three "angry" or frowning emojis, and then noted in parentheses that the "[v]ideo [had been] [r]emoved to protect the innocent."

Fielding did not expressly name the Credit Union or Oliver in his post. However, he "tagged" the Credit Union at the end of the post, as well as a local news organization, the San Francisco Department of Public Health, and the office of San Francisco's Mayor, and he set his location for the post as the Credit Union.

## B.    *The Credit Union's Lawsuit and Fielding's Anti-SLAPP Motion*

A month later, the Credit Union sued Fielding for defamation, trade libel, and declaratory and injunctive relief.[3]  The complaint alleged that Fielding negligently published false, unprivileged, and disparaging statements about the Credit Union based on Fielding's Facebook post and the picture attached to it.

After Fielding filed an answer to the complaint, he promptly brought a special motion to strike the complaint under California's anti-SLAPP statute. Fielding argued that his Facebook post constituted protected activity under section 425.16, because it was made in a public forum and was directly related to issues of public interest—the COVID-19 pandemic and the Credit Union's "disregard" for the health and safety of its employees and members and of the community.  He further asserted that the Credit Union could not establish a probability of prevailing on the merits of its claims because the allegedly defamatory statements constituted nonactionable opinions or, alternatively, were true.

---

[3] The complaint also names Jeremiah Mosely as a defendant, but this appeal concerns the trial court's granting of the anti-SLAPP motion brought by defendant Fielding.

In opposition, the Credit Union argued that the statements in Fielding's post contained provably false statements of fact and that the statements were, in fact, false. The Credit Union supported its opposition with declarations from a number of individuals, including its human resources manager discussing the precautionary measures the Credit Union took in response to the pandemic, including contact tracing and reporting confirmed COVID-19 cases to all employees who were potentially exposed to the infected person. Oliver also filed a declaration in which he stated that he had "never knowingly provided false, inaccurate or misleading information to the Board or concealed information [from them]."

The court granted Fielding's special motion to strike. The court first found that Fielding had met his burden of showing that the complaint arose from protected activity, as his Facebook post was "aimed at the issue of containing coronavirus spread[,]" which was a matter that interests not only "a portion of the public, but everyone who is at risk of infection." The court next found that the Credit Union failed to establish a probability of prevailing on the falsity and fault elements of its defamation claim. As to falsity, the court found that "[t]o the extent that the message is not opinion, the facts are largely uncontradicted." And it found that the Credit Union presented no evidence that Fielding failed to use reasonable care to determine the truth or falsity of his statements. The court further concluded that while the Credit Union had not separately addressed the trade libel claim, it had failed to satisfy its burden to show a probability of prevailing on that claim for the same reasons described in the court's analysis of the defamation claim. Finally, the court found that the Credit Union could not prevail on its claim for declaratory and injunctive relief because that claim was based on its other claims.

The Credit Union appeals from the order granting Fielding's anti-SLAPP motion.

## II. DISCUSSION

### A. *Standard of Review*

The anti-SLAPP statute allows a defendant to move for early dismissal of claims that are designed to chill the exercise of certain speech and petitioning activity protected by the state or federal constitution. (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1568.) A claim based on a defendant's constitutionally protected acts is subject to an anti-SLAPP motion to strike if the conduct is "in connection with a public issue." (§ 425.16, subd. (b)(1).) Subdivision (e) of section 425.16 enumerates four categories of conduct deemed "in connection with a public issue." (§ 425.16, subd. (e).) Fielding argues the third of these categories applies, as the defamation claim targets statements "made in . . . a public forum in connection with an issue of public interest . . . ." (§ 425.16, subd. (e)(3).) He also briefly contends that his Facebook post falls within the fourth category— "conduct in furtherance of the exercise of [a] constitutional right . . . in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4))—though his arguments focus on subdivision (e)(3) of section 425.16.

The trial court engages in a two-step process to determine whether to grant an anti-SLAPP motion. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.) First, the court decides whether a defendant has made a threshold showing that the challenged cause of action "aris[es] from" activity the statute protects. (*Ibid.*) If the defendant makes this threshold showing, the court must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th

6

82, 88.)  We review de novo the granting of an anti-SLAPP motion.  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

**B. *The Credit Union's Lawsuit Arises out of Protected Activity***

The Credit Union does not seriously dispute that its claims arise from Fielding's Facebook post; the parties dispute only whether the post constitutes protected speech under the anti-SLAPP statute.  (*Park v. Board of Trustees of California State University, supra*, 2 Cal.5th at p. 1062 ["A claim arises from protected activity when that activity underlies or forms the basis for the claim"].)  Fielding argues his Facebook post constitutes protected activity under section 425.16 because it was made in a public forum in connection with matters of public interest—the COVID-19 pandemic and issues "related to a credit union."  The Credit Union contends, however, that Fielding's post does not automatically become one of "public interest" by its publication in a public forum, and that statements arising from private workplace disputes are not matters of public interest.  Fielding has the better argument, as subdivision (e)(3) of section 425.16 applies to his post based on its connection to the public's interest in preventing the spread of COVID-19 within the community the Credit Union served.

There appears to be no dispute that Fielding's Facebook post was "made in a place open to the public or a public forum," thus satisfying the initial requirement of section 425.16, subdivision (e)(3).  Social media websites such as Facebook are public forums under the statute.  (*Cross v. Facebook, Inc.* (2017) 14 Cal.App.5th 190, 199.)  We thus focus on whether Fielding's Facebook post was made "in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4).)

"Section 425.16 does not define 'public interest,' but its preamble states that its provisions 'shall be construed broadly' to safeguard 'the valid exercise

7

of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039.) Despite the absence of a statutory definition, courts have concluded that speech on an issue of public interest can concern "a person or entity in the public eye [citations], conduct that could directly affect a large number of people beyond the direct participants [citations], or a topic of widespread, public interest [citations]." (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924; *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 33.) "[T]he issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." (*Nygard, Inc. v. Uusi-Kerttula*, at p. 1042.)

The Credit Union is not in the public eye, and there is no showing that its COVID-19 measures are, in and of themselves, a topic of widespread public interest. Nonetheless, information about a business's practices may constitute protected speech, at least when it could affect a large number of persons. (See *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898–899 [statements on website about business's unethical practices constituted consumer protection information, and thus were a matter of public interest]; *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 15 [development of a mall, "with potential environmental effects such as increased traffic and impaction on natural drainage, was clearly a matter of public interest"].) Whether such speech is protected often turns on whether the focus of the speech concerns matters that go beyond the speaker's particular interactions with the business. (See *Woodhill Ventures, LLC v. Yang* (2021) 68 Cal.App.5th 624, 634–636 [collecting consumer protection cases and concluding that the defendant's statements were not protected because they "relate only to one

8

transaction" with the plaintiff, and their purpose was "simply to gather '"ammunition for another round" ' " of private controversy].)

In *Wong v. Jing* (2010) 189 Cal.App.4th 1354, for example, the plaintiff, a pediatric dentist, filed a libel action against the defendants for their Yelp review, in which they claimed that the plaintiff used "laughing gas" on their son and filled his cavities with silver amalgam containing mercury. (*Id.* at pp. 1359, 1361.) On appeal from the trial court's denial of the defendants' anti-SLAPP motion, the appellate court concluded that the review involved a public issue, holding that "consumer information that goes beyond a particular interaction between the parties and implicates matters of public concern that can affect many people is generally deemed to involve an issue of public interest." (*Id.* at pp. 1363, 1366–1367.) Because the posting "implicitly dealt with the more general issues of the use of nitrous oxide and silver amalgam, implied that those substances should not be used in treating children, and informed readers that other dentists do not use them[,]" the court found that "the posting went beyond the parochial issues concerning a private dispute about particular dental appointments." (*Id.* at p. 1367.)

Similarly, speech in connection with a public issue includes attempts to inform the public or governing bodies about safety issues that could affect a large segment of the public. (See *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1420 [letter advising the governing body of a large condominium complex about one owner's alleged campaign of harassment against his tenant, which created nuisance and safety issues that could affect the other residents of the complex, was protected speech]; *Bishop v. The Bishop's School* (2022) 86 Cal.App.5th 893, 905, 908 [statement made to newspaper regarding teacher's termination was protected speech: "The content of the speech and conduct here—student safety and well-being—

9

implicates a matter that affects a large number of people beyond the direct participants, including all current and former students at the School, their family members, and the School's staff"].)

Here, the statements made by Fielding were not simply a report of a private workplace dispute, of interest only to him or to a small number of people. (See *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133 ["a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest"].) Rather, Fielding's statements were a warning that the Credit Union's actions (or lack thereof) posed a threat to the well-being of its employees and members and their families. Fielding made those statements during the COVID-19 pandemic, when the state required employers to take certain precautions to protect employees and the public from the risks of COVID-19. A business operating unsafely during the pandemic could sicken, and thus affect, many members of the public. Fielding's statements, therefore, concerned an issue of public concern.

The Credit Union argues that even assuming Fielding's statements implicate an issue of public interest, he cannot establish the requisite "functional relationship" between the speech and the issue of public interest under *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*), considering the timing and tone of his Facebook post.[4] In *FilmOn*, our high

---

[4] Fielding argues that the *FilmOn* test does not apply to subdivision (e)(3) of section 425.16 for statements made in a public forum in connection with a public issue, because the *FilmOn* court was construing subdivision (e)(4) of section 425.16, which protects "conduct in furtherance of the exercise of [a] constitutional right . . . in connection with a public issue or an issue of public interest . . . ." (See *FilmOn, supra*, 7 Cal.5th at p. 140.) At least one appellate court has concluded differently: "we see no reason why the same analysis should not apply when determining whether a statement was made 'in connection with' a public issue or a matter of public interest for purposes

court construed subdivision (e)(4) of section 425.16, the so-called "catchall" provision of the anti-SLAPP statute, clarifying how the context of a challenged statement informs our analysis of whether it is " 'in connection with a public issue.' " (*FilmOn*, at p. 140 [quoting § 425.16, subd. (e)(4)].) The court established a two-part inquiry for determining whether speech was made " 'in furtherance of' " free speech " 'in connection with a public issue or an issue of public interest.' " (*FilmOn*, at pp. 148–151.) First, looking at the content of a challenged statement, courts must determine whether the statement implicates a public issue or an issue of public interest. (*Id.* at pp. 150–151.) Second, where an issue is of public interest, courts must consider the "functional relationship" between the challenged speech and public conversation about the matter. (*Id.* at pp. 149–150.) " '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*Id.* at p. 150.) At this stage of the analysis, courts must consider context, including the identity of the speaker, the audience, and the apparent purpose of the speech. (*Id.* at pp. 142–144, 152.)

The *FilmOn* court emphasized that what it means to " 'contribute to the public debate' " may differ based on the topic of contention. (*FilmOn, supra*, 7 Cal.5th at pp. 150–151.) "We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through

---

of subdivision (e)(3) of section 425.16." (See *Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 23, fn. 5.) We similarly do not see why *FilmOn* has no bearing on this case, as the *FilmOn* court was concerned with the meaning of the phrase " 'in connection with an issue of public interest,' " a phrase that appears in both subdivisions. In any event, the outcome of this appeal would be the same regardless of whether we apply the *FilmOn* test to subdivision (e)(3) of section 425.16.

public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.) As an example, the court cited *Cross v. Cooper* (2011) 197 Cal.App.4th 357. (*FilmOn*, at p. 151.) There, a landlord filed an action against his tenants following a failed sale of his house, based in part on allegations that the tenants disclosed, or threatened to disclose, information that a registered sex offender lived nearby. (*Cross v. Cooper*, at p. 364.) The court found that preventing child abuse and protecting children from sexual predators were issues of widespread public interest, and that the tenants' disclosure was "directly related" to those issues because it "served th[e] interests" of preventing child abuse and protecting children by warning prospective buyers of the potential risk to children posed by a registered sex offender who lived nearby. (*Id.* at p. 375.)

Here, considering the audience and forum for the challenged statements, we have no trouble concluding that Fielding's post was directly related to an issue of public interest because it alerted the public of the potential health risk to many in the San Francisco community posed by the Credit Union's inadequate COVID-19 measures. As previously discussed, Fielding published his post in a public forum. He also "tagged" in the post local public officials and agencies, including the San Francisco Department of Public Health, and a news organization. This context suggests his purpose in publishing the post was to prompt local agencies to investigate the Credit Union for its COVID-19 response and to alert the public to a health and safety issue that could affect them. (See *Hicks v. Richard* (2019) 39 Cal.App.5th 1167, 1177 [finding that where a letter was sent to authorities outside the school, it "was intended to prompt these outside authorities to investigate and act on the allegations contained within it"]; *Yang v. Tenet*

12

*Healthcare Inc.* (2020) 48 Cal.App.5th 939, 948 [finding that defendants' allegedly defamatory statements "further[ed] the public discourse" regarding the qualifications, competence and professional ethics of a licensed physician where they "were communicated to the public, not just to discrete doctors or hospital staff members"].)

Contrary to the Credit Union's contention, the timing of the post also supports a connection between the statements and the topic of the spread of COVID-19 within a community. Fielding published his Facebook post shortly after an outbreak of COVID-19 had allegedly occurred among the Credit Union's employees. Although the post discusses the Credit Union's past actions in responding to the COVID-19 pandemic, and, as the Credit Union itself points out, Fielding was terminated several months before he made his post on Facebook, the post suggests that the recent outbreak was part of a pattern of the Credit Union ignoring the threat of COVID-19 to the well-being of its employees and client base. Thus, the timing of the post coupled with its purpose—to make the public aware of the Credit Union's inadequate COVID-19 measures immediately after a recent outbreak among the Credit Union's employees—demonstrates that the statements were sufficiently connected to an issue of public interest: the spread of a life-threatening contagious disease.

The Credit Union also claims that the tone of the post undermines any "altruistic" purpose or connection to the public issue of COVID, citing the post's concluding remark—"[t]his is one of the worst places I have ever worked and one of the worst CEO's [sic] I have EVER dealt with." The Credit union relies on *Weinberg v. Feisel, supra*, 110 Cal.App.4th 1122 for the proposition that "the assertion of a broad and amorphous public interest is not sufficient." It is true that it is not enough to draw a connection between

13

the challenged speech and some " 'broad and amorphous public interest.' " (*Id.* at pp. 1132, 1570; see *Dual Diagnostics Treatment Center, Inc. v. Buschel* (2016) 6 Cal.App.5th 1098, 1106, disagreed with on another ground in *Yang v. Tenet Healthcare, Inc.* (2020) 48 Cal.App.5th 939, 947 ["Almost any statement, no matter how specific, can be construed to relate to some broader topic"].) But the issue of public interest addressed by Fielding's Facebook post—a business's failure to take adequate precautions against the spread of a life-threatening contagious disease—was hardly abstract or amorphous. This is also not a case where the challenged speech is not focused on advancing the public interest but rather is "a mere effort 'to gather ammunition for another round of [private] controversy . . . .' " (*Weinberg v. Feisel*, at pp. 1132–1133.) That Fielding concluded his post with what appears to be his personal opinion of the Credit Union and Oliver does not transform his post into one about a private dispute, because the post's overall focus is aimed squarely at the Credit Union's COVID-19 measures and the risks they posed to employees and members. (See *Balla v. Hall* (2021) 59 Cal.App.5th 652, 674, disagreed with on another ground in *Park v. Nazari* (2023) 93 Cal.App.5th 1099, 1108, fn. 5 [finding that e-mail concerned a public issue, "despite isolated statements that touched on other subjects"]; *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1249 [" 'speech is rarely "about" any single issue' "].)

We conclude, therefore, that the Credit Union's claims arose from statements made in connection with an issue in the public interest, and that Fielding, therefore, met the burden imposed on him by section 425.16.[5]

---

[5] In coming to this conclusion, we have not relied on the factual assertions in Fielding's brief regarding the COVID-19 pandemic that are unsupported by anything in the record.

### C. Probability of Prevailing

As Fielding met his initial burden, the burden shifted to the Credit Union to establish a probability that it would prevail on its claims. The Credit Union does not separately address its trade libel claim, and thus we deem that claim abandoned, and focus solely on the Credit Union's defamation claim. (See *McGettigan v. Bay Area Rapid Transit Dist.* (1997) 57 Cal.App.4th 1011, 1016 & fn. 4.)

The second step of the anti-SLAPP analysis follows a "summary-judgment-like procedure." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.) We "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) Looking at those affidavits, "[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.)

" 'Defamation is the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or that causes special damage.' " (*Dickinson v. Cosby* (2019) 37 Cal.App.5th 1138, 1155.) The plaintiff in a defamation action "bears the burden of proving that the challenged statement was false." (*Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1021.) A private party plaintiff must also establish, at minimum, that the defendant failed to use reasonable care to determine the falsity of the statement. (*Carney v. Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1015.)

15

The parties disagree on whether the Credit Union has established a probability of prevailing on three elements of its defamation claim—provably false assertions of fact, falsity, and fault.[6] We consider each element in turn, concluding that the Credit Union has met its minimal burden of a "prima facie showing sufficient to sustain a favorable judgment." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384–385.)

### 1. *Provably False Assertions of Fact*

Fielding argues that the Credit Union has not met its burden on the second step of the anti-SLAPP analysis because the statements in his post mainly consist of nonactionable opinions. We disagree.

Unlike mere opinions, a statement that suggests or implies a false assertion of fact is actionable. (*Balla v. Hall, supra*, 59 Cal.App.5th at p. 677; *Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702.) The "dispositive question" in such a case is "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385.) This is ordinarily a question of law for the court, "unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood." (*Ibid.*)

In determining whether the disputed statement communicates or implies a provably false assertion of fact, we look at the totality of the circumstances, looking first to the language of the statement and whether it

---

[6] The Credit Union also contends that Fielding's statements have the natural tendency to injure. Fielding does not appear to dispute this. "A corporation can be libeled by statements which injure its business reputation" (*Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 381), and "[a] corporation's reputation as an employer is . . . an important aspect of its business reputation" (*Di Giorgio Fruit Corp. v. AFL-CIO* (1963) 215 Cal.App.2d 560, 571).

16

was understood in a defamatory sense, and then considering the context in which the statement was made. (*Franklin v. Dynamic Details, Inc., supra*, 116 Cal.App.4th at p. 385.) We also consider "whether the reasonable or 'average' reader would so interpret the material. [Citations.] The 'average reader' is a reasonable member of the audience to which the material was originally addressed." (*Couch v. San Juan Unified School Dist.* (1995) 33 Cal.App.4th 1491, 1500.)

Looking at the totality of the circumstances in this case, we conclude that Fielding's post was "reasonably susceptible of an interpretation which implies a provably false assertion of actual fact." (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1608.)

First, we look at Fielding's language. Although his post arguably employs some hyperbolic language indicative of an opinion by, for example, describing Oliver as the "worst" CEO and claiming he "cares more about his own pockets . . . than he does about his employees," Fielding also supported that language with facts. (See *Balla v. Hall, supra*, 59 Cal.App.5th at pp. 681–682 ["But the insults used by Hall (e.g., a 'fraud') were in reference to the specific deal he alleged existed among plaintiffs; they were not the gist of his statements"].) He asserted that Oliver refused to implement a pandemic plan that Fielding wrote, that the Credit Union did "nothing about" employees testing positive for COVID-19, and that "inquiries" from the San Francisco Public Health Department "have gone unanswered" by Oliver. He further claimed that Oliver made misrepresentations to or concealed information from the Credit Union's Board. By providing these facts to support his claims about the Credit Union and Oliver, Fielding made comments that could reasonably be considered as asserting or implying provably false assertions of fact, even if some details are missing. (*Bently Reserve LP v. Papaliolios*

17

(2013) 218 Cal.App.4th 418, 428 (*Bently*); see also *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18–19 ["Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of facts"].)

We next turn to the broader context of Fielding's statements—posting on social media. He points out that "online discussions may look more like a vehicle for emotional catharsis than a forum for the rapid exchange of information and ideas." (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1163.) However, the mere fact that speech is published on an online forum does not necessarily make it nonactionable opinion.

In *Bently, supra*, 218 Cal.App.4th 418, the defendant posted a negative review of an apartment building to Yelp, a website that collects consumer reviews of businesses. (*Id.* at p. 423.) On appeal from an order denying the defendant's anti-SLAPP motion, the defendant argued that his Yelp review was nonactionable opinion, pointing to the fact that he posted it on the internet under a pseudonym. (*Id.* at pp. 425, 426, 429.) This court disagreed, finding that although his review contained some epithets, it was "factually specific and earnest" and contained "statements that could reasonably be understood as conveying facts—each provable and each meant to be used by prospective tenants to evaluate the Jones Building as a future residential choice." (*Id.* at p. 433.)

The *Bently* court contrasted the Yelp review with other anonymous Internet posts found to constitute nonactionable opinions. (*Bently, supra*, 218 Cal.App.4th at pp. 429–431.) In those cases, the reviewing court found that certain contextual factors—the posts' lack of formality, poor grammar, spelling, and "diatribe" nature, the generality or vagueness of the comments,

18

and the name of the forum the defendant used—supported a conclusion that the Internet postings were not actionable.  (*Ibid.*, citing *Krinsky v. Doe 6, supra,* 159 Cal.App.4th 1154, *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669 (*Summit Bank*), and *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1148.)

For example, in *Summit Bank*, relied on by Fielding, our colleagues in Division 4 of this court found that a former bank employee's posts about the bank in a section of the Craigslist website entitled " 'Rants and Raves' " contained nonactionable statements of opinion.  (*Summit Bank, supra*, 206 Cal.App.4th at pp. 677, 696, 700.)  The posts contained spelling errors, poor grammar, and crude name-calling, asserting, among other things, that "[t]he bitch CEO . . . thinks that the Bank is her personel [sic] Bank to do with it as she pleases," that the bank was a "problem Bank," and that "[a]ll the customer [sic] were left high and dry."  (*Id.* at pp. 679, 698.)  In concluding the statements were nonactionable opinions, the court explained that the name of the electronic bulletin board should have "predisposed [readers] . . . to view [the former employee's statements] with a certain amount of skepticism," and to understand they likely would "present one-sided viewpoints rather than assertions of provable facts."  (*Id.* at p. 696.)  The court additionally observed that the poor grammar and spelling used in the posts, coupled with the defendant's "colloquial epithets" strongly suggested he was communicating "his own sophisticated, florid opinions," which were not "to be understood as assertions of fact."  (*Id.* at p. 699.)

This case is closer to *Bently* than to *Summit Bank*, as the context and language employed in Fielding's post are of a different character than that in the posts at issue in *Summit Bank*.  To begin with, Fielding published the post on a social networking website "that enables . . . users worldwide to

19

connect and share information that is important to them"(*Cross v. Facebook, Inc., supra*, 14 Cal.App.5th at p. 195), rather than on the type of online message board in which "readers expect to see strongly worded opinions rather than objective facts" (*Summit Bank, supra*, 206 Cal.App.4th at p. 697). And, like the post in *Bently*, Fielding's post makes specific factual claims, as opposed to the vague implications of fact being discussed in *Summit Bank*. Although his post contains some hyperbole, as mentioned, it also contains many statements that could reasonably be understood as conveying facts meant to alert the public to the risk posed by the Credit Union's allegedly inadequate COVID-19 measures.  That Fielding used his real name in his post and "tagged" news organizations and public officials further supports a conclusion that his post was meant to be taken as a serious assertion of fact.

Therefore, the statements in Fielding's post, at a minimum, could be reasonably construed as assertions of fact.  We therefore turn to the falsity element of the Credit Union's defamation claim.

### 2. Falsity

The trial court found that the Credit Union failed to establish the falsity element of its defamation claim because the overall " 'gist or sting' here is that plaintiff was not doing enough to protect its employees from the pandemic risks," and the facts stated in the Facebook post "[were] largely uncontradicted."  It is true that "substantial truth" is a defense.  (*Dickinson v. Cosby, supra*, 17 Cal.App.5th at p. 691.)  "[T]he law does not require [the defendant] to justify the literal truth of every word of the allegedly defamatory content, nor must we parse each word ... to determine its truthfulness. 'It is sufficient if the defendant proves true the substance of the charge, irrespective of slight inaccuracy in the details, "so long as the imputation is substantially true so as to justify the 'gist or sting' of the

20

remark." [Citations.]' [Citation.]" (*Summit Bank, supra*, 206 Cal.App.4th at p. 697, italics omitted.)

" 'By the same token, not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action.' " (*Bently, supra*, 218 Cal.App.4th at p. 434; see *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 510 [interpreting California law, the Court explained, " '[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text' "].) " 'Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." [Citations.]' [Citation.]" (*Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 936.) "If any *material* part be not proved true, the plaintiff is entitled to damages in respect to that part." (*Shumate v. Johnson Publishing Co.* (1956) 139 Cal.App.2d 121, 132, italics added.)

Here, Fielding's post asserted that the Credit Union ignored reports of employees testing positive for COVID-19. He specifically claimed that three employees had recently tested positive, and the Credit Union did "nothing about it." He further claimed that "[o]ther infections at the branches went unreported and un treated [sic]" and that the Credit Union "refuse[d] to take appropriate precautions." However, the declaration of Maaike Jacobson, who had been the Credit Union's Human Resources Manager since before the pandemic, asserted that all employees were instructed to contact Human Resources upon learning about any potential exposure to COVID-19 or positive case. According to Jacobson, the Credit Union received notice of its first employee to test positive for COVID-19 in February 2021, several months after Fielding was terminated. She stated that for each positive COVID-19 case or potential exposure reported to Human Resources, the

21

Credit Union conducted contact tracing within 24 hours, and "the employees who were potentially exposed to COVID in their workplace were timely notified by phone and email and provided instructions based upon the local and state agencies' health recommendations at the time" and were provided "all pertinent details of the potential exposure . . . ." Additionally, after a third employee tested positive for COVID-19, the Credit Union posted a notice in "areas where employees who were not in close contact (and not within the scope of those employees requiring notice) were nonetheless notified."

Given the details provided by Jacobson about the Credit Union's extensive efforts to respond to positive COVID-19 reports, we do not agree that Fielding's assertion that the Credit Union did "nothing" constitutes a mere "slight inaccuracy." (See *Summit Bank v. Rogers, supra*, 206 Cal.App.4th at p. 697.) On this basis alone the Credit Union succeeded in carrying their minimal burden under the anti-SLAPP statute to establish the probable merit of the falsity element of its defamation claim and to negate Fielding's defense of substantial truth. (See *Wilbanks v. Wolk, supra*, 121 Cal.App.4th at p. 905 ["the plaintiff need not produce evidence that he or she can recover on every possible point urged"]; see also *Bently, supra*, 218 Cal.App.4th at p. 434 [plaintiff's burden met by prima facie showing of facts which, if accepted by trier of fact, would negate defendant's defenses].)

The Credit Union also adduced evidence raising a triable issue that its CEO, Oliver, was not "selective" in providing information to the Board of Directors and did not give them "false information to keep them at bay," as Fielding asserted in his post. The only evidence Fielding presented regarding this assertion is that he delivered reports to Oliver concerning "various breaches of security," and that the Chief Information Officer later informed

22

Fielding that the reports presented to the Board were missing "pertinent portions or not presented at all." On the other hand, the Credit Union presented evidence that Fielding gave his reports to the Chief Information Officer, not to Oliver, and that the Chief Information Officer was not "privy to private communications of the Board or fully apprised as to all information presented to and considered by the Board or by the Executive Committee." Oliver also asserted in his declaration, "I have never concealed information from the Board," and "I have never knowingly provided false, inaccurate or misleading information to the Board or concealed information to 'keep them at bay.'"

Accepting the Credit Union's evidence as true, a trier of fact could conclude that it would negate Fielding's defense that its statements regarding Oliver's communications with the Board were substantially true. (See *Bently, supra*, 218 Cal.App.4th at p. 434.) And considering the seriousness of those accusations, we cannot conclude that the statements would not " ' "have a different effect on the mind of the reader from that which the pleaded truth would have produced." ' " (*Issa v. Applegate, supra*, 31 Cal.App.5th at p. 708.)

Similarly, Fielding's post accused the Credit Union of ignoring inquiries from the San Francisco Public Health Department. But Oliver's declaration shows the contrary, stating that on the same day the Credit Union learned of a complaint submitted to the department, Oliver spoke with a representative from the department, and the department "was satisfied" with the Credit Union's COVID-19 policies and procedures and "[n]o further action was taken . . . ."

Given these triable issues in connection with the merits of the Credit Union's defamation claim, and the material nature of Fielding's statements, a

23

trier of fact might conclude his Facebook post was not substantially true. (*Hughes v. Hughes, supra*, 122 Cal.App.4th at p. 937 ["whether a statement is true or substantially true is normally considered to be a factual one"].) Thus, we consider whether the Credit Union met its burden to establish a probability of prevailing on the fault element of its defamation claim.

### 3. *Fault*

Liability for defamation cannot be imposed on a defendant without fault. (*Carney v. Santa Cruz Women Against Rape*, *supra,* 221 Cal.App.3d at p. 1015.) Our Supreme Court stated that negligence is the standard in California for private party plaintiffs: "We decline to diverge from the near unanimous authority that a private person need prove only negligence (rather than malice) to recover for defamation." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 742; accord, *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 398 ["private figures need prove only negligence"].) Thus, to recover for defamation, a private party plaintiff has the burden of proving that the defendant "failed to use reasonable care to determine the truth or falsity" of the defamatory statements.[7] (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 470; see *Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 448.)

---

[7] In comparison, a public official or public figure, to recover for defamation, must establish the defendant made the allegedly defamatory statement with "malice in its constitutional sense 'that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 114.) In this case, there is no indication that the Credit Union is a public figure. (See *id.* at p. 113 [a public figure is one who has either "'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts'" or has "'voluntarily inject[ed] himself or is drawn into a particular public controversy'"].)

24

Mindful that the Credit Union's burden is not high (*Overstock.com, Inc. v. Gradient Analytics, supra*, 151 Cal.App.4th at p. 699), we conclude it made a prima facie factual showing on the fault element of its defamation claim.

The Credit Union presented Jacobson's declaration, which showed that she "worked closely" with Oliver and other Human Resources personnel regarding the Credit Union's COVID-19 policies and procedures. As previously discussed, Jacobson's declaration showed that the COVID-19 procedures implemented by Human Resources were fairly extensive, and included contact tracing and notifying all employees who were potentially exposed to COVID-19-positive employees and visitors. Human Resources communicated the Credit Union's COVID-19 policies to employees through email, through its internal webpage, and through notices posted in the workplace, and employees were told to contact Human Resources upon learning about any potential exposure to COVID-19 or positive case. Additionally, Jacobson's declaration detailed the Credit Union's response to specific reports of employees testing positive.

And Oliver's declaration showed that Fielding did not attend Board or Executive Committee meetings, that those meetings were closed and confidential, that the Chief Information Officer, to whom Fielding reported, was not privy to all information presented to the Board and the Executive Committee, and that he (Oliver) never concealed information from the Board or knowingly misrepresented information. Finally, as we have already mentioned, his declaration is evidence that he, on behalf of the Credit Union, promptly responded to a complaint submitted to the San Francisco Public Health Department.

Jacobson's and Oliver's declarations, which we must accept as true, were prima facie evidence that Fielding was negligent in publishing his

Facebook post. This evidence tended to show Fielding knew about the Credit Union's COVID-19 policies and knew that its Human Resources department would be the most reliable source regarding information about reported positive cases of COVID-19 and the actions the Credit Union took in response to those reports. It also tended to show that only certain people within the company would likely be privy to all information conveyed to the Board and to the public health department. The Credit Union's evidence therefore supports an inference that Fielding did not investigate many of his claims, or at least that he did not conduct a reasonable investigation, because if he had contacted the sources he should have known would likely have accurate and complete information, he would have discovered information indicating that he had no reasonable basis for making the claims contained in his post. In other words, a reasonable jury could conclude that Fielding should have expanded his investigation further, especially considering the seriousness of his accusations. (See *Widener v. Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 435, overruled on other grounds in *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 846, fn. 9 ["the seriousness of the charge it was making called for a thorough investigation, but the record reveals that little or no investigation was conducted"]; *Carney, supra*, 221 Cal.App.3d at p. 1016, fn. 2 [one factor to consider is "the extent of damage to the plaintiff's reputation if the communication was false"].)

Moreover, the post itself suggests that Fielding did not have any reasonable basis for the statement that the Credit Union did "nothing about" three employees testing positive for COVID-19. It states that Fielding received a video from an "unknown" source "which took place at a former employer of mine today." The picture attached to his post depicts a poster stating, "Warn the staff? That 3 employees tested positive? NAH." The

26

record indicates that the video and the poster are both from another former employee's protest that took place at the Credit Union's San Francisco branch. Given that Fielding published his post the same day he received the video from an "unknown source," and the fact that his post makes a similar claim as that in the poster, there is a reasonable inference that Fielding did nothing further to investigate the claim before publishing it. A reasonable jury could conclude that it was negligent for Fielding to rely on an anonymous source (or another former employee) for the claim in his post absent any meaningful investigation to corroborate the claim.

In sum, the record presents triable issues of fact with respect to the elements of the Credit Union's defamation cause of action. In light of its minimal burden at this stage of the inquiry, we conclude that the Credit Union demonstrated a probability of prevailing on its defamation claim.

## III. CONCLUSION

The order granting Fielding's special motion to strike is reversed in part. On remand, the trial court is directed to enter an order denying the motion to strike as to the Credit Union's defamation claim. The order denying Fielding's motion to strike is affirmed as to the Credit Union's trade libel claim. Each side shall bear its own costs.

BOWEN, J.*

WE CONCUR:


MARGULIES, ACTING P.J.


BANKE, J.


A163729N

---

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.